UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                      Case No. 3:20-cr-20587-1

v.                                   Hon. Matthew F. Leitman

BRANDON JOHNSON,               Magistrate R. Steven Whalen

               Defendant.

_____/

## DEFENDANT BRANDON JOHNSON'S SENTENCING MEMORANDUM

This Sentencing Memorandum is not an effort of Defendant Brandon Johnson ("Mr. Johnson") to avoid culpability for his crimes. To the contrary, he fully acknowledged the extent of his crimes during this Court's Plea Agreement Hearing. Mr. Johnson accepts full responsibility that he is guilty of two counts of knowingly and willfully filing a false tax return in violation of 26 U.S.C. § 7206(1).

This Memorandum is filed purely as a means of providing a more complete picture of the person Mr. Johnson is and continues to be – a hard-working family man that is deeply engaged in his community. Moreover, this Memorandum is also filed to provide some additional context for the opioid addiction that served as the underpinning vice that fueled Mr. Johnson's tax crimes. Indeed, in a very serendipitous twist of fate, had an IRS Agent not made a visit to Mr. Johnson's family

1

office on the morning of October 12, 2017, and served as the catalyst for him to seek treatment, then it is very possible that Mr. Johnson would have succumbed to his addiction and become yet another statistic of the opioid crisis.

If Mr. Johnson is sentenced to a long period of incarceration, it would significantly jeopardize the financial stability of his family and will also cause a domino effect of unanticipated suffering for other non-culpable parties. Therefore, under the circumstances, Mr. Johnson - a first time felony offender that has provided substantial assistance to the Government in prosecuting others - respectfully requests that this Court consider a sentence of supervised release with conditions of community service, followed by a long-term period of probation that includes regular drug testing and continued participation in a drug treatment program.

## I.    PROCEDURAL HISTORY

On December 4, 2020, the United States of America ("Government") charged Mr. Johnson in a two-count Information with knowingly and willfully filing a false tax return in violation of 26 U.S.C. § 7206(1). *See* ECF. No. 1. Just over a month later, on January 14, 2021, Mr. Johnson entered into a Plea Agreement with the Government by pleading guilty to two counts of knowingly and willfully filing a false tax return. *See* ECF No. 11. On the same day, the details of his crimes were specifically described under oath before this Court during the Parties' Rule 11 Plea Agreement Hearing and Arraignment.

2

Both counts carry with them a maximum penalty of up to three (3) years imprisonment, a discretionary fine of up to $250,000.00, a mandatory special assessment of $100.00, and the possibility of restitution. *Id.* In the Plea Agreement, the Parties stipulated only that "[t]he Court will determine the defendant's guideline range at sentencing." *Id.* at 6. The Parties further stipulated that Mr. Johnson has demonstrated timely acceptance of responsibility for his offenses and timely notified the Government of his intention to enter a guilty plea, which resulted in a three-level downward departure. *Id.* at 6-7. Pursuant to the Plea Agreement, Mr. Johnson agreed to pay restitution to the Government, with interest, in the amount of $4,808,156.00, under 18 U.S.C. § 3663(a)(3). *Id.* at 10-11. At the plea stage of this case, the Government made no other recommendations regarding Mr. Johnson's sentencing guideline. *Id.*

On or about April 15, 2021, the Probation Department provided defense counsel with a copy of its Presentencing Investigation Report (the "PIR"). The PIR calculates the applicable sentencing guideline range to be 46 to 57 months, based upon a total offense level of 23. *See* PIR, at 13. However, defense counsel believes the correct total offense level should be 21, which would result in a guideline range of 37 to 46 months.

Under the updates to the United States Sentencing Guidelines, effective November 1, 2023, Section 4C1.1 provides for a two-point decrease in offense level

for first time offenders that do not meet any of the criteria in subparts (a)(1) - (a)(10). At the time of drafting Mr. Johnson's PIR in 2021, these changes to the Sentencing Guidelines would not have been effective, but since they have come into effect, Mr. Johnson's total offense level should be calculated as 21, with a corresponding guideline range of 37 to 46 months.

Mr. Johnson is currently scheduled to be sentenced by this Court on March 13, 2024, at 2:00 p.m. Independent of prior determinations of the applicable sentencing guidelines, for the reasons stated herein, Mr. Johnson respectfully requests for this Court to consider a variance from the guidelines and issue a sentence of supervised release with conditions of community service, followed by a long-term period of probation that includes regular drug testing and continued participation in a drug treatment program.

## II.    BACKGROUND

### A.    Mr. Johnson Provided Substantial Assistance To The Government

In the years prior to and following his plea agreement, Mr. Johnson provided substantial assistance to the Government in the matter of *United States of America v. Matthew D. Adams*, Case No. 23-cr-20013 ("*U.S. v. Adams*"). In relevant part, Mr. Johnson provided necessary information to the Government related to payments he made to his drug dealer, defendant Matthew Adams ("Defendant Adams"). More specifically, Mr. Johnson provided details regarding how Defendant Adams set up a

shell-company that was disguised as a legitimate property management company but was in fact only being used to facilitate financial transactions tied to illegal narcotics.

In 2023, Defendant Adams was charged with one count of money laundering in violation of 18 U.S.C. § 1957 and one count of corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a). On February 14, 2023, Defendant Adams plead guilty to both counts and was sentenced before this Court on March 4, 2023. To secure this conviction, Mr. Johnson provided details concerning the sophisticated money laundering scheme that Defendant Adams had concocted in order to "wash" his drug money. According to the Government, Defendant Adams went on to use his illicit source of funds to purchase "private flights, golfing, jewelry, gambling, court-ordered child support, hotels, and [a] firearm. Defendant also purchased vehicles, including a Cadillac Escalade, a Hummer, and multiple classic cars." *See* Case No. 23-20013, ECF No. 4, at 8.

Accordingly, Mr. Johnson provided critical and timely information to the Government to aid in the prosecution of Defendant Adams. Indeed, within months of Mr. Johnson's assistance, the Government was able to zero in on Defendant Adams and bring his distribution of illegal narcotics to a stop. *Id.* at 7-8. This factor, in combination with the Government's anticipated 5k1.1 motion, would warrant a variance from the sentencing guidelines.

## B.   <u>Impacts of the Opioid Epidemic</u>

The fact that Mr. Johnson was addicted to opioids does not excuse his conduct, however, in the interest of leniency, the Court may wish to consider the backdrop of the national opioid epidemic as part of the context that drove Mr. Johnson's behavior. It is now well recognized that major pharmaceutical companies - primarily consisting of Purdue Pharma and the Sackler family - concealed the true addictive nature of opioids like OxyContin. Together, these bad actors worked in conjunction with lucrative marketing companies and an expansive network of doctors and pharmacies to push opioids on the public, which through the late 90's and 2000's caused the number of deaths due to opioid overdoses to skyrocket, with less than 5,000 deaths per year occurring in 1999 to more than 81,000 per year occurring in 2021.[1]

With its ample supply of blue-collar workers, Michigan has been one of the states most adversely impacted by the opioid crisis. Indeed, "[s]ince 2000, opioid overdose deaths have grown ten-fold in Michigan."[2] In 2021, Michigan Attorney

---

[1] National Institute for Drug Abuse, Drug Overdose Death Rates https://nida.nih.gov/ research-topics/trends-statistics/overdose-deathrates#:~:text=Opioid%2Dinvolved%20overdos e%20deaths%20rose,with%2080%2C411%20reported%20overdose%20deaths  (last   visited February 27, 2024).

[2] State of Michigan, *Opioid Settlement Resources*, https://www.michigan.gov/opioids /opioidsettlements/resources#:~:text=About%20the%20Opioid%20Settlements,%2C%20city%2 C%20and%20township%20governments (last visited February 27, 2024).

General, Dana Nessel, began working as part of a bipartisan coalition of Attorneys General to bring a litany of lawsuits against the manufacturers and distributers of opioids, which has resulted in more than $1.6 billion in settlements that will go towards Michigan's state and local units of government to be used towards opioid remediation.[3]   In a recent press release marking yet another settlement against entities involved in the chain of opioid distribution, Attorney General Nessel remarked as follows:

> According to the Michigan Department of Health and Human Services, between the years 2000 and 2020, the opioid death rate in Michigan increased on average 13.9% each year. These deaths—and the impacts on thousands who have struggled with opioid addiction—have created considerable costs for our health care, child welfare, and criminal justice systems. *More significant than the dollars and cents in damage to our state, the impact of opioid addiction, substance use, and overdose deaths has torn families apart, damaged relationships, and devastated communities*.[4]

The forgoing backdrop provides significant context to Mr. Johnson's case. After growing up in a house where addiction was prevalent,[5] Mr. Johnson was first prescribed opioids in 2000 after sustaining a college sports injury. *See PIR*, at 40.

---

[3] State of Michigan, Opioid Resources, https://www.michigan.gov/opioids/opioidse settlements/about (last visited February 27, 2024).

[4] *See* **Exhibit 1**, *AG Nessel Announces $350 Million Settlement with Multinational Marketing Firm Publicis Over Role in Opioid Epidemic* (emphasis added).

[5] Both Mr. Johnson's father and younger brother are recovering addicts as well. These individuals denote an extensive family history of addiction going back multiple generations. *See* **Exhibit 2**, *Letters From Mr. Johnson's Family.*

Throughout college and continuing for a number of years thereafter, Mr. Johnson was over-prescribed opioids by a doctor that he described as a "family friend." *Id.* Once this doctor would not prescribe Mr. Johnson any more opioids, he turned to more illicit sources. Later, Mr. Johnson was able to obtain OxyContin from Defendant Adams. *See PIR,* at ¶41. At the peak of his addiction, Mr. Johnson was taking over 3,000mg of OxyContin per day - approximately 37 pills at the maximum recommended 80mg dosage. *Id.* This amount of OxyContin would have killed any normal adult - *multiple times over* - however, Mr. Johnson built up such a tolerance that his addiction fueled an extremely high rate of consumption.

To feed his intake of OxyContin, Mr. Johnson ended up embezzling funds from his family business. Likewise, the funds that he embezzled were not reported as "income" on his tax returns, making those returns knowingly false. While the backdrop of opioid addiction does not excuse Mr. Johnson's behavior, it certainly explains it. Society now recognizes - after years of sustained litigation - that "big pharma" engaged in a systematic campaign to mislead consumers into believing that opioids were non-addictive, when in fact, opioids were highly addictive and overprescribed.

In a sense, Mr. Johnson and his family are victims of the opioid epidemic. The Department of Justice recognizes that the long-term abuse of drugs like OxyContin can lead to "physical dependence" and extreme withdrawal symptoms. *See* **Exhibit**

**3**, *U.S. Department of Justice OxyContin Fast Facts*. Indeed, when Mr. Johnson

checked into in-patient rehabilitation on October 13, 2017, he experienced severe

withdrawal symptoms that caused him to be hospitalized. Thereafter, it took him

nearly a year-and-a-half of recovery to feel "normal" again.

   To get a true sense for the impacts of opioid addiction on a family, the Court

should consider the Letter of Mandy Johnson ("Mrs. Johnson"), Mr. Johnson's Wife.

*See* **Exhibit 4**, *Mandy Johnson Letter*. In explicit detail, Mrs. Johnson sets forth Mr.

Johnson's struggles with opioids, but also describes the impacts it has had on her and

their children. For instance, at the time of discovering Mr. Johnson's relapse in 2017,

it threw their family into a period of crisis, which ran the gambit from financial

distress, to having to explain to her eight-year-old and ten-year-old children that their

father was a drug addict and was going to rehab for an unknown period of time. *Id.*

at 2. Mrs. Johnson also describes how she filed for divorce against Mr. Johnson, and

proceeded down this path for a number of years until she believed that he had been

rehabilitated from substance abuse. *Id.* Now, however, in a plea for leniency, she

describes how a sentence of incarceration will cause both her and their children

undue suffering, and she states as follows:

> I beg you to consider leniency when sentencing Brandon. Not just for
> him, but for our children. They have been through more than enough
> and I don't want to see their progress derailed. Brandon has worked so
> hard to get and stay sober, and we have taken many steps to rebuild our
> life. Not to mention, there is no way that I will be able to support us
> financially on my own. I would have to sell everything we own,

9

including the only home my children have ever known. As I said, Legal
bills and the time Brandon was unemployed have depleted every bit of
our savings, so I truly need him here to support our family. Please take
this into consideration and know that there is no punishment you could
impose that would be wore than what Brandon has already suffered. He
has a disease, and it is one that he continues to battle and overcome
every single day. Please allow him to continue to do so, because there
has never been anything Brandon can't accomplish once he sets his
mind to it.[6]

Thus, Mr. Johnson and his family have not only suffered financially from his

addiction fueled embezzlement, but there have been serious physical and mental

impacts as well. As will be addressed below, this may be an unanticipated hardship

not considered by the Sentencing Guidelines that is worthy of the Court's

consideration.

C.      **Mr. Johnson's Substantial Community Involvement**

Despite his addiction to opioids, Mr. Johnson is a person with a long track

record of community involvement. This includes not only donating his time to the

community in which he lives, St. Clair Shores, Michigan, but also to coaching youth

athletics for over a decade.

From 2009 through 2017, Mr. Johnson served as a member of the St. Clair

Shores Planning Commission. *See* **Exhibit 5**, *Robert Fetter, Esq. Letter.* Through

his involvement on the Planning Commission, Mr. Johnson was able to leverage his

---

[6] *See* **Exhibit 4**, at 4.

10

background in property management and contribute those skills to improve the community as a whole. Mr. Johnson and his son also volunteer regularly at a local St. Clair Shores homeless center. *See* **Exhibit 6,** *Paul Doppke Letter*.

More significantly, for more than a decade Mr. Johnson has been a dedicated youth sports coach. *Id.* In the past he has coached men's baseball and hockey through various organizations. Mr. Johnson continues to coach varsity baseball at University Liggett School and is the program director of Michigan Knights Baseball Club 10v - 17v. In a letter of support from Dr. Leython Williams, the University of Liggett athletic director, he notes that:

> Brandon's value to [Liggett] extends beyond the average parent or coach. He is a servant-leader that plays an essential role in many of the daily activities and ancillary programs at our school. Brandon is positive and uplifting to his players and colleagues in a manner that remains uncompromised in moments of adversity. University Liggett's core values are community, integrity, respect, empathy, and excellence. Brandon has shown consistency in living out these values personally and professionally.[7]

In a similar letter of support authored by Robert Fetter ("Mr. Fetter"), a partner at the law firm of Miller Cohen, P.L.C. and fellow sports coach, he describes Mr. Johnson's unwavering dedication to the kids he coaches. Mr. Fetter first notes that Mr. Johnson has been very transparent with parents - and players - about his addiction and legal troubles, and has used this matter as a demonstratable lesson in

---

[7] *See* **Exhibit 7**, *Dr. Leython Williams Letter*.

accepting responsibility. *Id.* at 2. In commenting further on Mr. Johnson's character,

Mr. Fetter states that:

> Over the years, Brandon has been dedicated to the boys - now young
> men. The time commitment that he has dedicated to them is massive -
> practices, games, training, travel, planning, fundraising, dealing with
> parents, team administration, etc. Coaching this type of team can also
> take an emotional toll on a coach. It is not an easy task and many
> coaches do not last more than a couple of years. By my count, Brandon
> has coached my son for nine years. The only reason that a coach lasts
> that long is because they derive a benefit to their soul from mentoring
> young people and affecting their growth as players, students, citizens,
> and meaningful contributors to society. Undoubtedly, that describes
> Brandon.[8]

In an eloquently stated plea for leniency, Mr. Fetter makes a final observation that

Mr. Johnson's service to the community sets him apart from other defendants and

that "a significant sentence would hurt the community *and particularly, a group of*

*young men would lose their mentor, coach, supporter and defender*." *Id.* (emphasis

added). This quote captures so much of the essence of this case; Mr. Johnson is a

flawed man, but he is not an evil man. His presence still has a lot to offer society,

his players, and his family.

Continuing in his theme as a "mentor," Mr. Johnson has been able to take his

experience in addiction and sobriety and help others through the process. This has

not been an easy path. Starting within 24-hours of when Mr. Johnson's family office

---

[8] *See* **Exhibit 5**, *at 2.*

was visited by an IRS agent, he had checked himself into an intensive in-patient rehab center in Florida. He would remain at this facility for almost two months, spending the first three-weeks just going through opioid detox. Thereafter, Mr. Johnson returned home to Michigan, but this was really just the start of his sobriety.

For a number of months thereafter, Mr. Johnson lived in a "sober living facility," where he underwent daily treatment and drug testing. Only after that did Mr. Johnson return to his family home, where, due to the fallout that had been caused by his actions, he lived separate from his family in the basement.

While Mr. Johnson's sobriety became more of a consistent factor in his life, so too, did his relationships with the family members he had harmed.  Indeed, he became affiliated with an Alcoholics Anonymous group known as "Noon Tide" in the neighboring city of Harper Woods, where he continues to attend meetings regularly. Within a few years of being a regular fixture at Noon Tide, Mr. Johnson was asked to guide some of the organizations "open talks," and he would regularly participate in these meetings.

In addition, as he progressed through the 12-step recovery process, Mr. Johnson took Step-12 to heart, which requires him to help others recovering from addiction. In this, Mr. Johnson formally mentors numerous people in the Noon Tide program, but he also informally mentors numerous other people struggling with addiction as well. As consideration for the Court, attached as **Exhibit 6** is a Letter

from Paul Doppke ("Mr. Doppke"), a prior business competitor, turned friend, of Mr. Johnson's who now acknowledges that Mr. Johnson has helped at least three of his employees through struggles with addiction.   Amongst other relevant observations, Mr. Doppke notes that Mr. Johnson "is a productive person in society and a wonderful example of what good can come from hard work and commitment after a time of despair." *Id.*

Thus, while Mr. Johnson stands ready to accept responsibility for his crimes, in a sense, he has attempted to make amends by accepting early responsibility for his wrongdoing, agreeing to pay restitution, and also by providing substantial assistance to the Government in developing evidence to prosecute others for breaking the law. Notwithstanding this, Mr. Johnson has been, and continues to be, a contributing member of society, such that, some would say he has "given" more than he has "taken."[9] Considering the forgoing, Mr. Johnson would humbly submit to the Court that these factors are worthy of a downward variance from the sentencing guidelines.

## II.   ARGUMENT

### A.   <u>Sentencing Standard</u>

---

[9] For additional consideration, please find the additional Letters of Support affixed hereto as: **Exhibit 8**, *Ltr. of Gina Forlettai;* **Exhibit 9**, *Ltr. of Jared Slanec;* **Exhibit 10,** *Ltr. of Sandy Kallek.*

The Guidelines are now but one of seven statutory factors to weigh when formulating a sentence. *United States v. Booker*, 543 U.S. 220 (2005); 18 U.S.C. § 3553. In *Booker*, the Supreme Court held that the mandatory manner in which the Guidelines required courts to impose sentencing enhancements based on facts found by the court, by a preponderance of the evidence, violated the Sixth Amendment to the Constitution. *Id.* at 233. Although the Guidelines are no longer mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." *Id*. The prevailing standard is appropriately described in *Gall v. United States,* 552 U.S. 38, 49 (2007):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See 551 U.S., at 347 – 348, 127 S.Ct. 2456. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

Similarly, the Sixth Circuit holds that in determining a criminal sentence, a district court must consider the factors listed in 18 U.S.C. § 3553(a). *United States v. Carballo-Arguelles*, 446 F. Supp. 2d 742, 743 (E.D. Mich. 2006). If the resulting departure range still does not serve the factors set forth in § 3553(a), the court may

then elect to impose a non-Guidelines sentence (a "variance sentence"), but should explain its reasons pursuant to 18 U.S.C. § 3553(c)(2). *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

### B.   A Downward Variance May Be Justified Under 18 U.S.C. § 3553

The Supreme Court's decision in *Booker* rendered the Sentencing Guidelines "advisory," requiring sentencing courts to tailor the sentence in light of other statutory concerns as well. *See Booker*, 543 U.S. at 233. Factors to be considered in 18 U.S.C. § 3553(a) include:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

(5)   Potential policy concerns . . . issued by the Sentencing Commission;

(6)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7)   The need to provide restitution to any victims of the offense.

Although Mr. Johnson does not foreclose of the Court taking any factor into account under Section 3553, "[i]t has been uniform and constant in the federal

judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. U.S.*, 518 U.S. 81, 113 (1996).

Moreover, 18 U.S.C. § 3661 states that, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Therefore, it is well within this Court's authority to consider all the facts mentioned in this case when deciding to grant a downward variance.

   i. *Section 3553(a)(1) - The Nature And Circumstances Of The Offense And The History And Characteristics Of The Defendant*

Pursuant to Section 3553(a)(1), the nature and circumstances and the characteristics of a defendant may be considered. Mr. Johnson is an individual who pled guilty to two counts of knowingly and willfully filing a false tax return in violation of 26 U.S.C. § 7206(1). Prior to this incident, Mr. Johnson was a hardworking family man with no history of felony criminal conduct.

Mr. Johnson remains a primary provider for his family and still supports his teenaged children through his first-hand operation of Evolutionary Management, Inc., a home renovation and property maintenance company. Thus, Mr. Johnson's

incarceration would have an unintended domino effect of causing his corporation to fail, thus depriving his family of their primary source of income.

There are a substantial number of cases which find a downward departure or variance justified based on the extraordinary effect to a business resulting in the loss of jobs. *See e.g., U.S. v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995) (Second Circuit affirmed a downward departure on the basis of business impact); *U.S. v. Olbres*, 99 F.3d 28 (1st Cir. 1996) (case remanded to determine if extent of job loss is outside the heartland of such cases); *U.S. v. Kloda*, 133 F.Supp.2d 345 (S.D.N.Y. 2001) (in business tax fraud case, one-level departure granted in part because of "the needs of [defendant's] business and employees").

In addition, as was addressed above in significant detail, Mr. Johnson himself is a victim of the opioid crisis. Indeed, he grew up in a household where addiction was prevalent, and went on to be prescribed so-called "non-addictive" opioids, which eventually completely consumed his life. Hundreds of lawsuits across the United States recognize that opioid manufactures lied to regulators, and mislead the public as to the true addictive nature of the drugs they were selling. Moreover, it is well founded that big pharma worked in conjunction with advertising companies and a network of doctors and pharmacies to intentionally overprescribe opioids to consumers. All this being said, state attorneys general have gone to great lengths to hold these bad actors accountable, however, there has been no direct relief to those

who suffer fallout in the legal system due to their addiction. Mr. Johnson's sentencing provides an opportunity for the Court to take this factor into consideration.

Indeed, as the Sixth Circuit has remarked, "addiction is a powerful voice."[10] *See United States v. Dishman*, No. 22-5517, 2023 WL 3815098, at *4 (6th Cir. June 5, 2023) (affirming downward variance in sentencing based on drug addiction).[11] The Sixth Circuit has repeatedly found information relating to an individual's childhood trauma, mental health, *and addiction issues*, among other things, to be relevant to sentencing. *See United States v. Banks*, 722 F. App'x 505, 511–12 (6th Cir. 2018) (holding that sentence was procedurally and substantively reasonable

___

[10] In *United States v. Freeman*, 992 F.3d 268, 280 (4th Cir. 2021), *on reh'g en banc*, 24 F.4th 320 (4th Cir. 2022), a case addressing a downward variance based on addiction, the Court's opinion included the following passage from the Texas Bar Journal about an attorney's struggle with the addictive nature of painkillers:

> "Lortab filled the void in my life. After taking one a day for the first month or so, I moved up to two a day, three a day, and, before I knew it, I had gone through the three refills remaining on the prescription. When I ran out of refills, I started going to doctors I knew, making up symptoms such as pain or a severe cough so that they would prescribe something containing hydrocodone, the active ingredient in Lortab. I spent all day at work thinking about how I could get my hands on more Lortab. Eventually, my habit got to 30 tablets a day. This pattern continued for the next two years, with my habit eventually reaching 50 tablets a day, taking 10 at a time every six hours or so. If I ever ran out, I would go into horrible withdrawals, with diarrhea, my legs shaking uncontrollably, my nose running, and being unable to sleep or think straight until I either got more drugs or a week or two had passed."

[11] All unpublished cases are attached hereto as **Exhibit 11**.

19

when "the district court weighed [defendant's] personal history and characteristics including his criminal history, difficult childhood, family support, addiction issues, past efforts to reform, and his renewed commitment to rehabilitation").

One other factor that the Court should consider is Mr. Johnson's considerable track record of donating his time to help others. Whether as a youth sports coach or currently through his involvement in helping recovering addicts, Mr. Johnson has always donated his time to the betterment of others - and has requested nothing in return.  There is ample legal authority to grant a variance under § 3553 based on a person's exceptional community and charitable works. *United States v. Crouse*, 145 F.3d 786, 790 (6th Cir.1998) (noting charitable work is not a forbidden ground for departure); *United States v. Kuhn*, 351 F. Supp. 2d 696, 704 (E.D. Mich. 2005) (granting a departure based on defendants charitable works). Hence, this factor too is worthy of the Court's consideration.

Thus, the extraordinary financial impact to Mr. Johnson's family is not something anticipated by the Guidelines, nor is the context of the opioid epidemic or Mr. Johnson's long-term commitment to the service of others. This is, however, a matter which warrants great consideration before this Court. Accordingly, it is within this Court's discretion to grant a downward variance for consequences that are unanticipated by the sentencing guidelines.

    ii.  *Section 3553(a)(2) - The Need For The Sentence Imposed*

Under § 3553(a)(2)(A) – (D), this Court can take into consideration traditional sentencing concerns. In the case at hand, there is no indication these factors weigh against Mr. Johnson.

There is certainly no need to protect the public from further criminal conduct as Mr. Johnson's criminal conduct was a non-violent isolated incident. Moreover, Mr. Johnson has demonstrated complete acceptance of responsibility for his criminal conduct and has assisted the Government in the prosecution of his drug dealer, Defendant Adams. Mr. Johnson immediately held himself accountable for his crimes, has cooperated with the prosecution and other Government entities throughout the course of the Plea Agreement, and has shown great remorse for what he has done. Significantly, Mr. Johnson has been completely sober for over six years and regularly attends drug treatment meetings as a means of maintaining his sobriety.

Taking these facts into consideration, a variance sentence of supervised release, with appropriate conditions, would likely be adequate to reflect the seriousness of the offense and Mr. Johnson's proactive steps to take early responsibility for his crime.

<em>iii.   Sections 3553(a)(3) - The Kinds Of Sentences Available</em>

Importantly, § 3553(a)(3) directs this Court to consider the kinds of sentences available and encourages the Court to consider sentencing options such as probation

or other non-custodial forms of punishment. These forms of punishment are often assigned for first time offenders who plead guilty to a single count non-violent crimes. *See e.g., United States v. Atkins,* No. CV 3:15-CR-519-L, 2016 WL 7240594, at *1 (N.D. Tex. Nov. 4, 2016)*, (after pleading guilty to a single count of conspiracy to commit healthcare fraud, defendant was sentenced to three years' probation and nine months of home confinement). In some instances within the Sixth Circuit, first time offenders who plead guilty to <u>multiple</u> non-violent felonies have still received probationary sentences. *See e.g., United States v. Hunt,* 521 F.3d 636 (6th Cir. 2008) (Defendant was convicted in the United States District Court for the Middle District of Tennessee, of health care fraud, conspiracy to commit health care fraud, and making false statements relating to health care fraud, and *was sentenced to five years of probation*) (emphasis added); *see also, United States v. Del Campo*, 695 F. App'x 453 (11th Cir. 2017) (Defendant convicted of bank fraud, which carried a sentencing guideline of 46 to 57 months and was sentenced to five years of supervised release, the first six months of which were to be served under home detention).

Thus, in order to avoid sentencing disparities, the Court should consider alternatives to incarceration.

      iv.    *Sections 3553(a)(4) and (5) - Other concerns set forth by the Sentencing Guidelines and Policy*

The fourth and fifth factors, § 3553(a)(4) – (5), require this Court to consider other factors enumerated in the Sentencing Guidelines and Policy Statements applicable to this case. In this regard, the Court may look to USSG § 5k1.1 which calls for considering "circumstances not adequately considered" by the sentencing guidelines. While the Court is free to grant or deny the Government's motion for a downward departure, the facts giving rise to said motion are nonetheless worthy of the Courts consideration.  *See United States v. Strickland*, 144 F.3d 412, 418 (6th Cir. 1998) (noting that discretion rest with the district court to grant or deny a 'substantial assistance' motion).

Indeed, Mr. Johnson did substantially assist the Government in investigating and prosecuting a bad actor, Defendant Adams. Accordingly, these facts are ripe for this Court's consideration under other factors enumerated in Sentencing Guidelines and Policy Statements applicable to this case. Therefore, a downward variance is a worthy consideration.

> V.   *Sections 3553(a)(6) - The Need To Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct*

The sixth factor, Section 3553(a)(6), focuses on the need to avoid sentencing disparities among similarly situated defendants. In this regard, defense counsel incorporates the proceeding sections of this Brief where instances are cited to which illustrate that defendants have received a substantially lower non-custodial sentence

23

than recommended by the guidelines. Notwithstanding those cases, there is also a further mitigating factor in the present matter because Mr. Johnson has provided substantial assistance to the Government and is also eligible for leniency based on a Section 5k1.1 departure from the guidelines. Thus, when considering the totality of the circumstances, Mr. Johnson would fall into a category of non-violent first-time offenders that receive largely non-custodial sentences, but he has the additional mitigating factor of also providing substantial assistance to the Government.

      *vi.*    *Sections 3553(a)(7) - The Need To Provide Restitution To Any Victims Of The Offense*

Finally, Section 3553(a)(7) focuses on restitution. In the matter at hand, Mr. Johnson has already agreed to pay full restation to the Government in the amount of $4,808,156.00 as is fully set forth in his Plea Agreement. *See* ECF No. 11, at 10 - 11. If Mr. Johnson can maintain gainful employment, then he will have a reasonable chance at fulfilling at least some of his restitution obligations.

Thus, a complete analysis of the § 3553(a) factors as set forth above, weigh in Mr. Johnson's favor and provide ample grounds for this Court to issue a variance from the Sentencing Guidelines.

## III.   CONCLUSION

The experience of facing his failures and addiction in this situation has had a profound impact on Mr. Johnson. He has placed all that he holds dear in this world in jeopardy and genuinely feels a great sense of remorse for the heartache he has

caused his family. The psychological, physical, and emotional toll that he, his immediate family, and extended family have experienced is not something that can be reflected in the words of this Memorandum alone. Mr. Johnson stands before this Court a humbled man. He seeks a measure of mercy, not with an aim to avoid responsibility or justice, but simply for an opportunity to continue to rebuild and preserve his life and the security of his family.

Based on the foregoing authorities and arguments discussed herein, and further evidence to be presented at sentencing, Mr. Johnson respectfully requests that this Court impose a sentence of supervised release with conditions of community service, followed by a long-term period of probation that includes regular drug testing and continued participation in a drug treatment program.

Respectfully submitted,

VARNUM LLP

Date: April 29, 2024

By: _/s/ Eric M. Nemeth_
ERIC M. NEMETH (P42925)
WILLIAM L. THOMPSON (P80123)
*Attorneys for Defendant*
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7300
Email: emnemeth@varnumlaw.com
        wlthompson@varnumlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2024, I served the Memorandum on all counsel of record via the ECF filing system.

/s/   *Karri Standish*
Karri Standish

22492881.1

26